# NO. 24-6691

In The

# United States Court Of Appeals
## For The Fourth Circuit

**THOMAS SHEPPHEARD; TYLER RANDALL;
ADAM PERRY, next friend and guardian of Minor child;
J. P., on their own behalf and on behalf
of all others similarly situated,**

*Plaintiffs – Appellants,*

v.

**JAMES C. JUSTICE, JR., his official capacity as
Governor of the State of West Virginia; MARK SORSAIA,
in his official capacity as the Cabinet Secretary
of the West Virginia Department of Homeland Security,**

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT BECKLEY

———————

**BRIEF OF APPELLEES**

———————

**J. Zak Ritchie**
**Michael B. Hissam**
**Maureen Gleason**
**HISSAM FORMAN DONOVAN RITCHIE PLLC**
**P.O. Box 3983**
**Charleston, WV 25339**
**681-265-3802 office**

*Counsel for Appellee James Justice Jr.*

**Natalie C. Schaefer**
**Caleb B. David**
**Kimberly M. Bandy**
**SHUMAN MCCUSKEY SLICER PLLC**
**P.O. Box 3953**
**Charleston, WV 25339**
**(304) 345-1400; (304) 343-1826 (fax)**

*Counsel for Appellee Mark Sorsaia*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-6691__          Caption: _Thomas Sheppheard v. James Justice, Jr._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Mark Sorsaia_
(name of party/amicus)

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

12/01/2019 SCC                    - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: s/Natalie C. Schaefer _____     Date: _____08/01/2024_____

Counsel for: Mark Sorsaia _____

- 2 -

[ Print to PDF for Filing ]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-6691__        Caption: __Thomas Sheppheard, et al. v. James C. Justice, II, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__James C. Justice, II__
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                  ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ J. Zak Ritchie _____     Date: _____ 8/1/24 _____

Counsel for: James C. Justice, II _____

- 2 -

[Print to PDF for Filing]

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 2

STATEMENT OF THE ISSUES ........................................................... 3

STATEMENT OF THE CASE .............................................................. 3

I.    Plaintiffs file a putative class action against the Governor
      and Secretary challenging the conditions of their
      confinement under the Eighth Amendment ................................... 3

II.   The Governor and the Secretary move to dismiss on
      numerous grounds, including lack of Article III standing ........... 11

III.  The District Court dismisses Plaintiffs' claims for lack of
      Article III standing ..................................................................... 12

SUMMARY OF ARGUMENT ............................................................ 13

ARGUMENT ..................................................................................... 17

I.    The District Court properly dismissed Plaintiffs' claims for
      lack of standing ........................................................................... 17

      A.    Plaintiffs lack standing to sue the Governor ........................ 18

      B.    Plaintiffs lack standing to sue the Secretary ....................... 27

II.   Even if Plaintiffs have standing, the Court should affirm the
      District Court's order on other grounds ....................................... 32

i

A.    State sovereign immunity bars the claims against the
      Governor and the Secretary ................................................... 32

B.    Plaintiffs fail to state a claim of deliberate indifference
      under the Eighth Amendment against either the
      Governor or the Secretary ...................................................... 37

      1.    Plaintiffs fail to allege conditions of confinement
            sufficiently serious to amount to an Eighth
            Amendment violation ................................................... 38

      2.    Plaintiffs fail to allege facts showing that either
            the Governor or the Secretary were subjectively
            deliberately indifferent to the health and safety
            needs of West Virginia inmates ................................... 42

C.    The Tenth Amendment bars the claims against the
      Governor and the Secretary ................................................... 45

D.    Plaintiffs' claims are moot ..................................................... 50

CONCLUSION ................................................................................. 52

STATEMENT ON ORAL ARGUMENT ................................................ 52

CERTIFICATE OF COMPLIANCE ....................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Evac EMS, Inc. v. Cheatham,*
  910 F.3d 751 (4th Cir. 2018) .................................................. 18, 20

*Alden v. Maine,*
  527 U.S. 706 (1999) ........................................................... 32

*Arizona Christian Sch. Tuition Org. v. Winn,*
  563 U.S. 125 (2011) ........................................................... 31

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ....................................................... 37, 43

*Ashker v. Brown,*
  2013 U.S. Dist. LEXIS 51148 (N.D. Cal. Apr. 9, 2013) ................ 31

*Ex parte Ayers,*
  123 U.S. 443 (1887) ........................................................... 33

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................... 37

*Bogan v. Scott-Harris,*
  523 U.S. 44 (1998) ......................................................... 26, 27

*Bragg v. W. Va. Coal Ass'n,*
  248 F.3d 275 (4th Cir. 2001) ................................................ 33

*Brown v. Plata,*
  563 U.S. 493 (2011) ..................................................... 25, 31, 40

*Burnett v. Fallin,*
  785 F. App'x 546 (10th Cir. 2019) ......................................... 26

*Church of Scientology of Cal. v. United States,*
  506 U.S. 9 (1992) ............................................................. 50

*College Sav. Bank. v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
    527 U.S. 666 (1999) ...................................................................... 33

*Deal v. Mercer Cnty. Bd. of Educ.*,
    911 F.3d 183 (4th Cir. 2018) ........................................................ 18

*Disability Rts. S.C. v. McMaster*,
    24 F.4th 893 (4th Cir. 2022)................................................. *passim*

*Doe v. Va. Dep't of State Police*,
    713 F.3d 745 (4th Cir. 2013) .................................. 12, 14, 22, 23, 29

*Doyle v. Hogan*,
    1 F.4th 249 (4th Cir. 2021)................................... 15, 27, 34, 35, 36

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ................................................. 38, 39, 42, 43

*Frank Krasner Enters., Ltd. v. Montgomery Cnty.*,
    401 F.3d 230 (4th Cir. 2005) ........................................................ 19

*Frew ex rel. Frew v. Hawkins*,
    540 U.S. 431 (2004) ...................................................................... 34

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...................................................................... 22

*Hall v. Virginia*,
    385 F.3d 421 (4th Cir. 2004) ........................................................ 51

*Jones v. Gusman*,
    296 F.R.D. 416 (E.D. La. 2013) .................................................... 31

*Mays v. Sprinkle*,
    992 F.3d 295 (4th Cir. 2021) ........................................................ 38

*Powell v. McCormack*,
    395 U.S. 486 (1969) ...................................................................... 50

*Preiser v. Rodriquez,*
    411 U.S. 475 (1973) ........................................................ 24

*Printz v. United States,*
    521 U.S. 898 (1997) ................................................... 16, 48

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,*
    506 U.S. 139 (1993) ........................................................ 33

*Rhodes v. Chapman,*
    452 U.S. 3378 (1981) ........................................... 39, 40, 41

*Ross v. Reed,*
    719 F.2d 689 (4th Cir. 1983) ........................................ 50

*Scinto v. Stansberry,*
    841 F.3d 219 (4th Cir. 2016) ......................... 38, 39, 42, 43

*Scott v. United States,*
    328 F.3d 132 (4th Cir. 2003) ........................................ 32

*Shears v. Rockefeller,*
    728 F. Supp. 1546 (S.D.W. Va. 1986) .......................... 24

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ................................................... 17, 18

*Supreme Court of Va. v. Consumer Union of U.S., Inc.,*
    446 U.S. 719 (1980) ........................................................ 26

*Tishkof v. Fallin,*
    No. CIV-17-421-RAW-SPS, 2019 WL 1413754
    (E.D. Okla. Mar. 28, 2019) .......................................... 26

*Waste Mgmt. Holdings, Inc. v. Gilmore,*
    252 F.3d 316 (4th Cir. 2001) ............................. 27, 35, 36

*Wildlife Fed'n v. Limehouse,*
    549 F.3d 324 (4th Cir. 2008) ..................... 20, 21, 35, 36

*Wilson v. Seiter*,
    501 U.S. 294 (1991) ...................................................... 38

*Ex parte Young*,
    209 U.S. 123 (1908) ............................................... *passim*

**Statutes**

18 U.S.C. § 2254 ............................................................ 24

18 U.S.C. § 3626(a)(3)(A)(i)–(ii) ................................... 25

18 U.S.C. § 3626(a)(3)(E) .............................................. 25

18 U.S.C. § 3626(a)(3)(A)–(F) ....................................... 24

28 U.S.C. § 1291 .............................................................. 2

28 U.S.C. § 1331 .............................................................. 2

28 U.S.C. § 2242 ............................................................ 24

42 U.S.C. § 1983 ............................................... 27, 37, 43

W. Va. Code § 5–1–18 ................................................... 46

W. Va. Code § 5F–2–2(a)(7) ......................................... 29

W. Va. Code § 5F–2–2(a)(8) ......................................... 29

W. Va. Code § 15A–1–9(e)(1) .................................. 29, 30

W. Va. Code § 15A–3–4(a)(1), (3) ................................ 28

W. Va. Code § 15A–3–4(a)(1), (3), and (8) .................. 30

W. Va. Code § 15A–3–12(a) .......................................... 30

## Constitutional Provisions

U.S. Const. amend. VIII ................................................................. *passim*

U.S. Const. amend. X ...................................................................... *passim*

U.S. Const. amend. XI .................................................... 2, 21, 32, 33

U.S. Const. amend. XIV ............................................................... 33

U.S. Const. art. III, § 2 .................................................................. 17

W. Va. Const. art. VI, § 51 ................................................... 10, 28

W. Va. Const. art. X § 3 .............................................................. 10

## Other Authorities

SB 1039, 2023 Leg. 1st Spec. Sess. (W. Va. 2023) ................................. 51

HB 2024, 2023 Leg., Reg, Sess. (W. Va. 2023) ...................................... 46

WV Division of Corrections and Rehabilitation
   https://dcr.wv.gov/news/Pages/WV-DCR-announces-
   new-pay-rates-in-effect-July-1.aspx
   (last visted October 10, 2024) .......................................................... 51

## INTRODUCTION

In the case below, Plaintiff-Appellants filed a putative class action lawsuit alleging an Eighth Amendment claim challenging the conditions of confinement in the state correctional institutions in which they were being held. But instead of suing the officials directly responsible for and, importantly, empowered under state law to address the particular unconstitutional conditions alleged, Plaintiffs tactically sued *only* the Governor of the State of West Virginia and Cabinet Secretary of the West Virginia Department of Homeland Security for declaratory and injunctive relief. As the remedy, Plaintiffs demand a federal judicial decree compelling the Governor and Secretary to spend no less than $330 million—encompassing a vast amount of *unappropriated* public funds—on correctional improvements that *Plaintiffs believe* are necessary, in addition to unspecified new policies and procedures to apply within the confines of the correctional facilities. From its inception, this was a wholly political lawsuit—about discretionary policy and funding decisions by the elected branches of state government—but assuredly not a legal one.

But that choice has *legal* consequences.

For starters, Plaintiffs lack Article III standing—as the District Court correctly concluded in its dismissal order. Specifically, Plaintiffs fail to demonstrate that their alleged ongoing injuries are fairly traceable to the Governor's or the Secretary's particularly alleged wrongdoing or would be redressed by a favorable ruling against either of them. That is reason enough to affirm.

Even though the District Court declined to address the myriad other legal infirmities with Plaintiffs' politically based lawsuit, this Court is well within its power to affirm for any of the additional, independent grounds readily apparent from the record. And it should do so if necessary. These include (1) state sovereign immunity (also called Eleventh Amendment immunity); (2) failure to state a claim upon which relief can be granted; (3) the Tenth Amendment; and, (4) mootness.

In all events, the District Court's judgment should be affirmed.

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1291 to review the District Court's order dismissing Plaintiffs' claims for lack of Article III standing.

## STATEMENT OF THE ISSUES

1. Whether the Plaintiffs fail to demonstrate Article III standing to sue the Governor and the Secretary.

2. Whether state sovereign immunity and *Ex parte* Young bar Plaintiffs' claims.

3. Whether the Plaintiffs fail to state a plausible Eighth Amendment claim.

4. Whether the Tenth Amendment bars Plaintiffs' claims.

5. Whether the Plaintiffs' claims are now moot.

## STATEMENT OF THE CASE

**I.    Plaintiffs file a putative class action against the Governor and Secretary challenging the conditions of their confinement under the Eighth Amendment.**

On August 8, 2023, Plaintiffs Thomas Sheppheard, Tyler Randall, and Adam Perry (as next friend and guardian to minor child J.P.), on behalf of themselves and putative classes, filed a complaint alleging that West Virginia's correctional institutions are being operated in violation of the Eighth Amendment to the United States Constitution. Plaintiffs alleged a single Eighth Amendment claim for deliberate indifference to the health, safety, and other basic needs of Plaintiffs and similarly situated inmates.

But the complaint named just two defendants—James C. Justice, II, the Governor, and Mark Sorsaia, the Cabinet Secretary of the

Department Homeland Security, in their official capacities only.

Plaintiffs did not name any superintendent or other official with direct

responsibility over the conditions of confinement in state correctional

facilities, as is typical in a conditions-of-confinement case. In their

single cause of action, Plaintiffs attempt to allege that the Governor and

the Secretary were objectively aware of unconstitutional conditions at

state correctional facilities and remained subjectively deliberately

indifferent to them, thus amounting to a violation of the Eighth

Amendment.

Plaintiffs structured their complaint to allege unconstitutional

conditions of confinement at three separate types of correctional

facilities found in West Virginia: a prison, a regional jail, and a juvenile

institution—and on that basis, each plaintiff purports to represent all

inmates at all other West Virginia facilities in those categories. Plaintiff

Thomas Sheppheard, a current inmate at Mount Olive Correctional

Center, claims to represent all West Virginia prison inmates. Plaintiff

Tyler Randall, a former inmate at Southwestern Regional Jail (and

current inmate at Salem Correctional Center), claims to represent all

West Virginia regional jail inmates. And Plaintiff Adam Perry, on

behalf of minor J.P., a resident at Donald R. Kuhn Juvenile Facility, claims to represent all juvenile facility residents in West Virginia.

Each plaintiff has alleged separate, purportedly unconstitutional conditions of confinement at their respective facilities. Mr. Sheppheard alleges that at Mt. Olive, he was given inadequate portions of food, the water in the showers burned his back, he was not allowed recreational time, and he did not have regular access to toothbrushes, toothpaste, or the law library. JA34. Mr. Randall alleges that while at the Southwestern Regional Jail, he was housed in an overcrowded cell, he saw inmates sleeping on the floor, he was given inadequate portions of food, and he was exposed to mold and rodent feces in his pod. JA36. And Mr. Perry alleges that while at Kuhn, J.P. was served undercooked food and had irregular access to hot water. JA39.

The complaint does not allege that either the Governor or Secretary Sorsaia had direct knowledge of any of the Plaintiffs or the specific conditions they faced. Instead, the complaint alleges that the Governor knew that state correctional facilities were generally overcrowded, understaffed, and had deferred maintenance, and that although the State theoretically then-had funding available—in the

form of an alleged $1.8 billion budget surplus—the Governor did not spend $330 million on jails, prisons, and juvenile centers. (Plaintiffs picked that number).[1] *See* JA30 (asserting that the Governor "is *only* planning to spend $100 million on deferred maintenance."); JA30 (taking issue with the Governor's stated policy decision to "work with the legislature to take what's left unappropriated [of the budget surplus] and continue to make wise investments in what we know will bring us more goodness, like infrastructure, federal matches, and tourism, because the more we tell the world about West Virginia, the more people will want to live, work, and raise their families here."). That failure, Plaintiffs allege, amounts to deliberate indifference.

Plaintiffs' factual allegations of deliberate indifference focus entirely on the actions of the Governor, attributing no actions (or inactions) to the Secretary. And far from alleging facts indicating deliberate indifference, the complaint *affirmatively* (if unintentionally) demonstrates the Governor's commitment to *improving* conditions in state correctional facilities. *See, e.g.*, JA22 (alleging that "Governor

---

[1] Plaintiffs make no allegations as to Secretary Sorsaia's knowledge of conditions of confinement in any correctional facility.

Justice issued Executive Order 5-22 finding that: 'A state of Emergency exists in West Virginia as it pertains to the staffing levels of our juvenile and adult detention and correctional facilities.'"); JA22 (alleging that the Governor "recognized that 'any shortage of correctional officers limits the ability to properly supervise the State's incarcerated individuals' and lack of proper supervision may present a danger to the incarcerated individuals and others"); JA100 (Governor's Executive Order) (authorizing the use of the West Virginia National Guard to help staff juvenile and adult lockups until legislative and operational solutions can be developed and implemented); JA23 (alleging that the Governor called in the West Virginia National Guard "to help staff the facilities"); JA26 (alleging that "the Governor's office" conferred with the Division of Corrections and Rehabilitation concerning "the deferred maintenance list" at "correctional facilities"); JA28 (alleging that "representatives from the Governor's office" were part of "meetings" with legislators and budget office officials concerning the use of funds to "improve . . . issues with West Virginia's jails"); JA30 (alleging that the Governor is "planning on spending $100 million on deferred maintenance" at state correctional institutions); JA22

(incorporating document at n.2, stating that the Governor has "engag[ed] with a bipartisan group of legislators in order to sponsor a bill that would have afforded a $10,000 locality pay adjustment for Correctional Officers across the state where locality pay is necessary for maintaining critical missions of safety and security"); JA22 (same, quoting the Governor, "Of course, we will continue to work with all stakeholders moving forward to perfect the legislation, get it reintroduced, and, ultimately, get it across the finish line, but we need to do something to address the staffing shortages in our jails right now. These are critical positions and if numbers continue to dip, failure to act could become a safety concern."); JA22 (same, discussing the Governor's detailed locality pay proposal); JA23 (incorporating document at n.3, stating that the Governor "is working with state lawmakers toward a resolution" on corrections staffing and that "[a]s soon as a consensus emerges, he said he will call in lawmakers for a special session"); JA23 (incorporating document at n.5, stating that "House and Senate leaders along with the governor's office have been meeting in recent weeks, working toward a possible solution to the problem of runaway worker vacancy rates in the state's jails and prisons"); JA23 (same, stating that

"Justice, who declared a state of emergency last August and put 300 National Guard members in the jails and prisons to help, acknowledged during last week's media briefing that meetings are taking place" and that "Justice has previously supported a pay raise and did so again in comments he made last week"); JA23 (same, noting that the Governor had "floated two previous plans" to address correctional employee compensation); JA24 (stating that the Governor signed a pay raise bill for state correctional employees in 2018 that was implemented over the following three years).

For the Governor's alleged constitutional violations, Plaintiffs sought relief that was as sweeping as it was obviously barred by well-established law. In addition to class treatment and a declaratory judgment, Plaintiffs asked the District Court to "compel" the Governor to [1] "spend state budget surplus funds (or submit bills, call for special session, etc.) in order to make all of the necessary deferred maintenance repairs required at all West Virginia correctional facilities in an amount not less than *270 million dollars*;" and [2] to further "spend state budget surplus funds to hire and pay the requisite number of correctional staff needed to appropriately staff the facilities, not less than *60 million*

9

*dollars*[.]" JA41 (emphases added). In sum, Plaintiffs sought an order decreeing that the Governor spend *no less than $330 million* in "state budget surplus funds."

Plaintiffs seek the requested relief from the Governor and the Secretary. As even Plaintiffs acknowledged in the complaint, neither the Governor nor the Secretary has the ability to "spend state budget surplus funds." As Plaintiffs recognize, the Governor, for his part, "is responsible for submitting *a proposed* budget for each fiscal year to the legislature for consideration pursuant to W. Va. Const. art. VI, § 51." JA18 (emphasis added). It is the Legislature that can actually appropriate funds—after revising the Governor's proposed budget, if they see fit. JA18 (citing W. Va. Const. art. X § 3).

Apart from relying on the exaggerated notion of the Governor's executive powers, the complaint fails to connect either the Governor or the Secretary to the actual operations of West Virginia's correctional facilities beyond a general duty to supervise executive branch personnel. The Governor's alleged connection to West Virginia's correctional facilities is his responsibility for "carrying out various executive functions including, *inter alia*, corrections." JA18. Similarly,

10

the complaint alleges no specific duty or involvement of the Secretary to connect him to the particular conditions of confinement in the State's correctional facilities. Instead, it asserts that the Secretary "is charged with providing support, oversight, and guidance to the West Virginia Division of Corrections and Rehabilitation." JA18.

## II. The Governor and the Secretary move to dismiss on numerous grounds, including lack of Article III standing.

Governor Justice and Secretary Sorsaia each filed motions to dismiss. *See* JA112, JA168. The Secretary raised eight arguments for dismissal, chief among them that Plaintiffs lack standing and their claims are barred by state sovereign immunity. JA144–148. By his motion to dismiss, the Governor joined in the Secretary's arguments and detailed how the arguments regarding standing and state sovereign immunity also apply to the Governor. JA174–183. The Governor additionally argued that because the only facts Plaintiffs alleged with respect to him indicate that he acted to alleviate understaffing, overcrowding, and deferred maintenance, Plaintiffs failed to state a plausible claim for deliberate indifference against the Governor. JA183–87.

## III. The District Court dismisses Plaintiffs' claims for lack of Article III standing.

The District Court concluded that Plaintiffs lacked Article III standing, granting the motions to dismiss. JA1454. The District Court recognized that, "the Complaint, on its face, suggests that [Plaintiffs'] injuries are due in large part to the 'independent action of some third party not before the court,' namely the legislature." JA1462–1463. Accordingly, Plaintiffs could not establish that either the Secretary or the Governor possessed the requisite causal connection to establish standing. JA1462; JA1467. The District Court further concluded that Plaintiffs' reliance on the general supervisory duties of the Governor and the Secretary were insufficient to establish standing. JA1462 (citing *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022)).

The District Court went on to conclude that even if the Plaintiffs could trace their alleged injuries to the Secretary or the Governor, "it is 'merely speculative' that such injuries would be redressed by a favorable decision against [them]." JA1463 (quoting *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013)). In determining the redressability of an injunctive order against the Governor, the District

12

Court recognized that "the Court 'cannot control the exercise of the discretion of an officer [of the State]." JA1467 (quoting *Ex parte Young*, 209 U.S. 123, 158 (1908)). Thus, the District Court explained, "to the extent the Plaintiffs suggest Governor Justice can remedy the alleged overcrowding by using his discretionary pardon power, the Court cannot order such relief." JA1467. Without the ability to craft such orders, the Court concluded that an injunction enjoining the Governor from engaging in any further unconstitutional action was unlikely to redress Plaintiffs' alleged injuries. JA1467. Accordingly, the District Court dismissed Plaintiffs' claims without addressing the Governor's or the Secretary's various other arguments supporting dismissal.

This appeal followed.

## SUMMARY OF ARGUMENT

The District Court's order of dismissal should be affirmed. The District Court properly concluded that Plaintiffs do not possess standing to sue the Governor and the Secretary because they cannot show that their actions are fairly traceable to Plaintiffs' alleged injuries, or that an order against either the Governor or the Secretary would redress them.

To demonstrate traceability, Plaintiffs must show that the actions of the Governor and the Secretary—and not "the independent action of some third party not before the court"—caused their alleged injuries. Because Plaintiffs' complaint relies almost exclusively on the failure *to appropriate* funds—a function constitutionally reserved for the Legislature—as the cause of their injuries, Plaintiffs cannot establish that the actions of either the Governor or the Secretary caused their alleged injuries.

To establish redressability, Plaintiffs must show that it is "likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision." *Disability Rts.*, 24 F.4th at 903. But similar to traceability, "redressability is 'problematic when third persons not party to the litigation must act in order for an injury to arise or be cured.'" *Id.* (quoting *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013)). And, as with traceability, the Legislature would have to act to appropriate the funds requested by Plaintiffs, the Commissioner of the Division of Rehabilitation and Corrections would have to act to oversee deferred maintenance projects, the superintendents of each facility would have to act to fix shower temperatures and ensure that food is cooked.

The Court can likewise affirm the District Court's dismissal order for the separate and independent reason that state sovereign immunity bars these claims. The Supreme Court has long held that where there is no waiver of sovereign immunity, a defendant state official must have some enforcement power over the challenged law or conduct. *Ex parte Young*, 209 U.S. at 157. "[I]t is not enough that the officer possesses the *general authority* to enforce the laws of the state broadly if the officer cannot enforce the law at issue." *Doyle v. Hogan*, 1 F.4th 249, 254–55 (4th Cir. 2021).

Here, the Governor is charged with generally supervising the Executive branch. He does that by appointing cabinet secretaries to oversee departments of the State. Secretary Sorsaia is charged with generally supervising the Department of Homeland Security, of which the Division of Corrections and Rehabilitation is a part. Neither is charged with overseeing any single correctional facility, or even with operating the Division itself. As such, both the Governor and the Secretary lack the necessary enforcement connection and authority to directly remedy the particularly alleged unconstitutional conditions of confinement in the State's correctional facilities to trigger *Ex parte Young*.

15

Finally, even if the Court concludes that the Plaintiffs possess standing, it can affirm the District Court's dismissal order for three separate and independent reasons.

First, the Plaintiffs have failed to state a claim for deliberate indifference against either the Governor or the Secretary. Far from alleging that the Governor *ignored* jail conditions, Plaintiffs affirmatively allege that the Governor subjectively recognized issues and acted repeatedly to remedy them. As to the Secretary, Plaintiffs make no specific allegation of any action or inaction taken by the Secretary whatsoever with respect to correctional conditions.

Second, Plaintiffs' requested injunctive relief is barred by the Tenth Amendment, which prevents the federal government from stepping into the shoes of a state legislator or executive to manage state affairs. *Printz v. United States*, 521 U.S. 898, 918-919 (1997). Plaintiffs ask the District Court to order the Governor (and the Secretary) to appropriate approximately $330 million of state budget surplus funds, submit bills, and even call for special sessions. Such an injunction asks the federal court to step into the role of Governor and perform wholly discretionary functions not delegated to the

16

United States—and thus reserved to the State. *See* U.S. Const. Amend. 10.

Finally, Plaintiffs' claims are moot. Plaintiffs complain that funds have not been allocated to increase correctional officer pay or to address deferred maintenance. Yet in 2023, the Legislature allocated $228 million to go to deferred maintenance in the State's prisons and schools. $100 million of that allocated money has been or will be spent on deferred maintenance in corrections. Later in 2023, the Legislature appropriated funding for increased correctional officer pay. And on July 1, 2024, the Commissioner for the Division of Corrections and Rehabilitation announced a pay raise for all correctional officers. Thus, the harm identified by Plaintiffs has been remedied.

## ARGUMENT

### I.    The District Court properly dismissed Plaintiffs' claims for lack of standing.

The "judicial Power" extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" that "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330,

338 (2016). "To satisfy the irreducible constitutional minimum of standing, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (cleaned up). Plaintiffs, as "the part[ies] invoking federal jurisdiction, bear[] the burden of establishing these elements." *Spokeo*, 578 U.S. at 338. They fail to do so here.

## A.     Plaintiffs lack standing to sue the Governor

**1.**  The injuries alleged in the complaint are not fairly traceable to the Governor's actions in merely proposing budgets or generally supervising the Executive branch. A plaintiff's injury satisfies the traceability element of standing when there is "a causal connection between the injury and the [defendant's] conduct complained of by the plaintiff." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (cleaned up). "While the defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was *caused by the defendant*, as opposed to the 'independent action of some third party not before the court.'" *Id.*

18

(quoting *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005)) (emphasis added).

Under the circumstances presented here, this Court's traceability analysis applies principles from the *Ex parte Young* context. *See Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022). Specifically, the question of a causal connection looks to whether the defendant has the power to enforce the complained-of statute or is otherwise empowered under state law to directly remedy the plaintiffs' injuries. *See id.* (applying *Ex parte Young* caselaw). As this Court has made clear, "[t]hese principles apply with equal force in the standing context." *Id.* Application of standing principles means that "[w]hen a defendant has no role in enforcing the law at issue, it follows that the plaintiff's injury allegedly caused by that law is not traceable to the defendant." *Disability Rights*, 24 F.4th at 902.

As with the plaintiffs suing Governor McMaster in *Disability Rights*, Plaintiffs here cannot rely on Governor Justice's "general" duty and right to enforce state law and oversee the executive branch to satisfy the traceability element of standing. *But that is the only authority Plaintiffs identified in the complaint. See* JA18. As a result,

19

Plaintiffs have not satisfied their burden to demonstrate the "causal connection" between the existing conditions of confinement and the Governor's "conduct complained of by the plaintiff." *Air Evac EMS*, 910 F.3d at 760 (cleaned up). *Disability Rights* compels dismissal of this action. 24 F.4th at 901–02.

Plaintiffs attempt to save their "causal connection" to the Governor's actions by alleging that "Governor Justice has been deeply involved in the correctional system of the State." Opening Br. at 19. Plaintiffs assert that under this Court's precedent, the Governor's "deep involvement" with the State's correctional system provides sufficient traceability to establish standing. *Id.* (citing *Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008)). In *Limehouse*, after recognizing that general enforcement authority was not sufficient to sue a government official, the court concluded that as the individual "with responsibility for carrying out [the agency's] policies and representing the agency in its dealings with the federal government," the Director of the South Carolina Department of Transportation ("SCDOT") had sufficient causal connection to plaintiffs' claims. 549

F.3d at 333.[2] Because the plaintiffs in *Limehouse* were challenging SCDOT's compliance with federal environmental law, the court also considered SCDOT's detailed involvement in that compliance process, and concluded that the Director's supervision of those tasks was sufficient causal connection.

Governor Justice's supervisory power and authority is not comparable to that of the Director of SCDOT. Neither the Governor nor his office is responsible for carrying out the policies of the Division of Corrections and Rehabilitation; they do not implement procedures in individual facilities; nor do they apply for necessary permits or oversee maintenance projects. By his State of Emergency Order, for example, the Governor simply empowered the Adjutant General and the Secretary of the Department of Homeland Security to best address the staffing shortages using the National Guard. JA101. The Governor took no part in allocating staff to various facilities, determining which tasks the National Guard would fulfill, or scheduling shifts. The Governor thus lacks the requisite causal connection to establish traceability.

---

[2] The Court conducted its "causal connection" analysis in the Eleventh Amendment context, but the analysis "appl[ies] with equal force in the standing context." *Disability Rts.*, 24 F.4th at 901.

**2.** Nor are Plaintiffs' alleged injuries redressable by a favorable ruling against the Governor. "An injury is redressable if it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). But attempting to satisfy redressability becomes "problematic when third persons not party to the litigation must act in order for an injury to arise or be cured." *Id.*

An order enjoining the Governor from engaging in the allegedly unconstitutional conditions of confinement, compelling *him* to implement and enforce policies, procedures, and practices aimed at ameliorating such conditions, and compelling him to "spend state budget surplus funds (or submit bills, call for a special session, etc.)" to that same end, would not redress Plaintiffs' alleged injuries. Plaintiffs fail to point to any direct or specific provisions of state law granting *the Governor* specific authority over the conditions of confinement in state correctional institutions and certainly no state law granting the Governor the legal authority to make appropriations, "so such an order would have no effect" on his allegedly unconstitutional conduct.

22

*Disability Rights*, 24 F.4th at 903. Their complaint is noticeably silent in this regard.

Rather, as Plaintiffs essentially admit in their prayer for relief, an order compelling the Governor to appropriate funds would unquestionably require the "act" of "third persons not party to the litigation" in order for the claimed injury to be "cured." *Doe*, 713 F.3d at 755. Here, that would mean the Legislature. It is the Legislature—not the Governor—that possesses the power of the purse. Further, any remedial order respecting the implementation of particular "policies, procedures, and practices" aimed at ameliorating the allegedly unconditional conditions within the identified facilities is also not within the legal authority specifically vested by the Legislature in the Office of the Governor.

Finally, Plaintiffs shift focus in their briefing on the Governor's power to pardon as a theory of standing. (It appears nowhere in the complaint). The District Court considered and swiftly rejected that theory of standing, and this Court should do so as well. As an initial matter, that power is discretionary. And as the District Court recognized, it cannot order the Governor to exercise his discretion in

any particular way. JA1467 (citing *Ex parte Young*, 209 U.S. 123, 158 (1908)).

Moreover, courts have long found that the Governor's power to pardon does not create a "legally enforceable entitlement" to release from state custody. *Shears v. Rockefeller*, 728 F. Supp. 1546, 1547 (S.D.W. Va. 1986). Instead, Congress has carefully and narrowly provided the instances in which a federal court may order the release of state prisoners—and they do not include suits against the Governor for failure to issue a discretionary pardon. Indeed, the Supreme Court has long held that 18 U.S.C. § 2254 provides the "sole federal remedy" for an inmate to obtain an order for his release from State custody. *Preiser v. Rodriquez*, 411 U.S. 475, 500 (1973). And in that instance, the writ "shall be directed to the person having custody over the person detained"—which is not the Governor. 28 U.S.C. § 2242.

The only other mechanism through which a federal court may order the release state prisoners is through a prisoner release order issued in accordance with the specific requirements of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(3)(A)–(F). Under the PLRA, a single district court may not issue a prisoner release order,

24

and the prisoner release order cannot be the remedy of first resort.
Rather, if a constitutional violation has not been remedied by a less
intrusive order than a prisoner release order, and the defendant has
had adequate time to comply with that less intrusive order, the court
may convene a three-judge panel to assess whether a prisoner release
order would be appropriate. § 3626(a)(3)(A)(i)–(ii). That panel must then
find by clear and convincing evidence that "crowding is the primary
cause of the violation of a Federal right" and that "no other relief will
remedy the violation of the Federal right." § 3626(a)(3)(E).

Here, as the District Court recognized, "Plaintiffs do not appear to
seek issuance of prisoner release orders from this Court as a remedy for
their alleged injuries." JA1466. Nor do they attempt to make any
demonstration that the Governor is the proper defendant against whom
such an order would issue. *See Brown v. Plata*, 563 U.S. 493 (2011)
(upholding prisoner release order that generally requested the State to
provide a plan to reduce the prison population to 137% of capacity, but
not ordering the Governor to exercise his pardon power). And Plaintiffs
make no attempt to show that they meet the criteria for a prisoner
release order. Indeed, Plaintiffs seem to allege that deferred

25

maintenance and understaffing—not overcrowding—are the primary causes of the alleged constitutional violation.

Finally, the fact that Plaintiffs fail to present a single citation of any federal court exercising jurisdiction over a state governor under *Ex parte Young* to remedy alleged overcrowding based on the governor's pardon and commutation powers should give the Court great pause. Where this argument has been made, it was rejected for these reasons. *See Tishkof v. Fallin*, No. CIV-17-421-RAW-SPS, 2019 WL 1413754, at *6 (E.D. Okla. Mar. 28, 2019) (relying on *Ex parte Young* in concluding that the federal court cannot "control" Governor Fallin's pardon or commutation decisions to "ease overcrowding" in an Eighth Amendment case); *see also Burnett v. Fallin*, 785 F. App'x 546, 553 (10th Cir. 2019) (rejecting argument that Governor Fallin's decisions not to commute "more sentences and grant[] more requests for clemency" cannot support an Eighth Amendment violation based on overcrowding).[3]

---

[3] *Tishkof* and *Burnett* also rely on legislative immunity to hold that the Governor cannot be sued for his "discretionary, policymaking decision[s] implicating the budgetary priorities of the [state] and the services the [state] provides." *Burnett*, 785 Fed. App'x at 551 (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998)). Such immunity would also apply here. *See Supreme Court of Va. v. Consumer Union of U.S., Inc.*, 446 U.S. 719, 733 (1980) (holding that legislative immunity is "applicable to

Accordingly, Plaintiffs fail to demonstrate that an order that can be entered by the District Court against the Governor would actually redress their claimed injury. This Court should thus affirm the District Court's dismissal order.

## B. Plaintiffs lack standing to sue the Secretary.

Plaintiffs also lack standing to sue the Secretary. Plaintiffs' only substantive allegation against him is that, "[a]s Cabinet Secretary of the WVDHS, Cabinet Secretary Sorsaia is charged with providing support, oversight, and guidance to the West Virginia Division of Corrections and Rehabilitation." JA18. This type of conclusory allegation of a general duty is exactly what this Court has deemed insufficient to establish the traceability requirement for standing. *See Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021) (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001)) (holding "it is not enough that the officer possesses the '*general authority* to enforce

---

§ 1983 actions seeking declaratory and injunctive relief"). This Court can affirm the District Court's dismissal for the additional, independent reason that the Governor is entitled to legislative immunity from suit regarding his "discretionary, policymaking decisions." *Bogan*, 523 U.S. at 55.

the laws of the state' broadly if the officer cannot enforce the law at issue") (emphasis in original).

This alleged general duty does not provide a sufficient "causal connection" between the Plaintiffs' alleged injuries and Secretary Sorsaia's conduct. *Disability Rights*, 24 F.4th at 901. The Secretary lacks appropriation powers, *see* W. Va. Const. Art. VI, § 51 (granting appropriation powers to Legislature), and the Secretary lacks statutory authority to enact policies and procedures for the West Virginia Division of Corrections and Rehabilitation. *See* W. Va. Code § 15A–3–4(a)(1), (3) (granting Commissioner of Division of Corrections and Rehabilitation general supervisory authority over correctional facilities and granting Commissioner authority to establish rules, policies and regulations governing facilities). Plaintiffs do not identify any specific or direct legal authority provided to the Secretary to carry out any of the relief requested. Without such authority, Plaintiffs have failed to establish traceability and, therefore, lack standing.

Similarly, Plaintiffs cannot obtain redress from an order against the Secretary because he has no authority to act as requested. Plaintiffs

seek injunctive relief from the Secretary in two ways: (1) appropriation of funds, and (2) enactment of policies and procedures.

The Legislature is empowered to appropriate funds pursuant to the West Virginia Constitution. Noticeably absent from the state constitution is any role for the Cabinet Secretary of the Department of Homeland Security in the appropriations process. The Secretary's budget authority extends only so far as "[f]ormulat[ing] comprehensive budgets for consideration by the Governor." W. Va. Code § 5F–2–2(a)(7). Although he maintains the authority to "[e]nter into contracts or agreements requiring the expenditure of public funds and authorize the expenditure or obligation of public funds as authorized by law," such authority necessarily requires legislative approval. W. Va. Code § 5F–2–2(a)(8); *see also* W. Va. Code § 15A–1–9(e)(1). Because the Secretary only has authority to *formulate* a budget proposal for *consideration* by the Governor that, even if agreed upon, requires legislative action, an order requiring the Secretary to appropriate funds would unquestionably require an "act" of "third persons not party to the litigation" in order for the claimed injury to be "cured." *Doe*, 713 F.3d at 755.

29

Moreover, the Legislature has instructed that the Secretary's powers "shall not exceed or be interpreted as authority to exceed the powers granted by the Legislature to the various commissioners, directors, or board members of the various departments, agencies, or boards that comprise and are incorporated into each secretary's department." W. Va. Code § 15A–1–9(e)(1). It is the Commissioner of the Division of Corrections and Rehabilitation, and not the Secretary, who is given the authority to "exercise general supervision over the administration of the institutions under the jurisdiction of the division[,]" "[e]stablish rules, policies, and regulations in writing governing all subdivisions and institutions within the division[,]" and "[s]upervise the treatment, custody, and discipline of all inmates and residents and the maintenance of the institutions and their industries[.]" W. Va. Code § 15A–3–4(a)(1), (3), and (8); § 15A–3–12(a) (listing facilities). Plaintiffs acknowledge as much, JA19, but did not name the Commissioner based upon the assertion that "the law does not require the doing of a useless thing." Opening Br. at 11. The "useless thing" is suing a party with no ability to redress alleged harms, as the District Court properly found below.

In their Opening Brief, Plaintiffs rely upon *Jones v. Gusman*, 296 F.R.D. 416, 423 (E.D. La. 2013). The reliance on this case is misplaced, because standing was not at issue in that case. *Jones* involved a facility operated by a parish sheriff and financed by a city in Louisiana. *Id.* at 459. The defendant and third-party defendant were the Orleans Parish Sheriff and the City of New Orleans, not the State of Louisiana or State officials. *Jones* has no relevance to the question of redressability, traceability, or any aspect of standing as it relates to the Governor or the Secretary. Similarly, neither *Brown v. Plata*, 563 U.S. 493 (2011), nor *Ashker v. Brown*, 2013 U.S. Dist. LEXIS 51148 (N.D. Cal. Apr. 9, 2013), relied upon by Plaintiffs, addressed questions of standing. Indeed, as the Supreme Court has repeatedly cautioned, a precedent that does not discuss standing or jurisdiction cannot be invoked as a precedent on standing or jurisdiction. *See, e.g., Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011) ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed.").

Accordingly, Plaintiffs fail to demonstrate that an order against the Secretary would actually redress their claimed injury.

II.    **Even if Plaintiffs have standing, the Court should affirm the District Court's order on other grounds.**

The order of dismissal should still be affirmed even if the Court concludes that Plaintiffs possess standing. It is well-established that the Court can affirm a district court's order "on any ground appearing in the record, including theories not relied upon or rejected by the district court." *Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003). And so, this Court may affirm the District Court's order on separate and independent grounds, including (1) state sovereign immunity (also called Eleventh Amendment immunity); (2) failure to state a claim upon which relief can be granted; (3) the Tenth Amendment, and (4) mootness.

A.    **State sovereign immunity bars the claims against the Governor and the Secretary.**

In our constitutional system, States "retain a residuary and inviolable sovereignty," *Alden v. Maine*, 527 U.S. 706, 715 (1999) (quoting The Federalist No. 39, at 245 (James Madison)), which is confirmed by the Eleventh Amendment, *id.* at 728–29. The doctrine of state sovereign immunity recognizes that "it is neither becoming nor convenient . . . that the course of [a State's] public policy and the

32

administration of their public affairs should be subject to and controlled by the mandates of judicial tribunals, without their consent, and in favor of individual interests." *Ex parte Ayers*, 123 U.S. 443, 505 (1887). In recognizing the importance of state sovereign immunity as an "essential element of the constitutional design," the Eleventh Amendment confirmed a limit on judicial power that "accords States the respect owed them as members of the federation." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 291 (4th Cir. 2001) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993)).

A state may thus be subject to suit only after Congress abrogates state sovereign immunity under the Fourteenth Amendment or when the State itself clearly and unequivocally consents. *See College Sav. Bank. v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Here, the Governor and the Secretary are sued only in their official capacities, meaning that this suit is effectively against the State, thereby implicating state sovereign immunity. And there has been no abrogation of sovereign immunity by Congress or waiver by the State. As such, Plaintiffs' claims against the Governor and the Secretary are

barred by state sovereign immunity unless Plaintiffs can establish the exception under *Ex parte Young*, 209 U.S. 123 (1908).

The *Ex parte Young* exception "permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). "This standard allows [federal] courts to order prospective relief, as well as measures ancillary to appropriate prospective relief," but *does not* permit the award of "retrospective relief," which includes "money damages or its equivalent." *Id.* (cleaned up).

To begin with, Plaintiffs fail to allege the required "special relation" between the Governor and the Secretary and the allegedly unconstitutional conditions of state correctional facilities. *Ex parte Young* authorizes suits only against officers with "some connection" to the enforcement of the challenged state activity. 209 U.S. at 157. "Without this enforcement duty, the officer is merely 'a representative of the State' who cannot be sued because allowing such a suit would essentially 'make the State a party.'" *Doyle v. Hogan*, 1 F.4th 249, 254–55 (4th Cir. 2021) (quoting *Ex parte Young*, 209 U.S. at 157). This "enforcement duty exists when there is a 'special relation'" between the

34

state officer sued and the allegedly unconstitutional statute or activity,

"which provides the officer with the authority to enforce the particular

law at issue." *Id.* (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252

F.3d 316, 331 (4th Cir. 2001)).

In this case, the Court is not working from a blank slate, for it has

repeatedly held that "it is not enough that the officer possesses the

'*general authority* to enforce the laws of the state' broadly if the officer

cannot enforce the law at issue." *Id.* at 255 (quoting *Waste Mgmt.*

*Holdings*, 252 F.3d at 331) (emphasis in *Doyle*). "Instead, the officer

sued must be able to enforce, if he so chooses, the specific law the

plaintiff challenges." *Id.*  Put another way, this requirement limits

plaintiffs to suing only those officers with *the legal ability to directly*

*remedy the alleged constitutional violation*, thereby ensuring that any

federal injunction "will be effective with respect to the underlying

claim." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir.

2008).

Indeed, this Court has repeatedly held that lawsuits against a

state's governor do *not* satisfy the *Ex parte Young* exception where

plaintiffs rely solely on a governor's general duty to enforce state law

and general power to control and supervise a state executive branch. *See, e.g., Doyle*, 1 F.4th at 255 (Md. Governor); *Waste Mgmt. Holdings*, 252 F.3d at 331 (Va. Governor); *see also Disability Rights S.C. v. McMaster*, 24 F.4th 893, 901–02 (4th Cir. 2022) (same analysis in standing context regarding S.C. Governor). But that is precisely what Plaintiffs rely on in their complaint.

In this case, the only allegations in the complaint that even try to draw an enforcement connection between the Governor's power and the challenged conduct (allegedly creating unconstitutional conditions at correctional facilities) is found in a single paragraph. There, Plaintiffs allege that the Governor is "responsible for [1] submitting a proposed budget for each fiscal year to the legislature for consideration . . . as well as [2] overseeing and carrying out various executive functions including, *inter alia*, corrections." JA18. Plaintiffs wholly fail to identify any or direct enforcement power that is specifically granted to the Governor over the conditions in the state's correctional institutions or for their funding, *Doyle*, 1 F.4th at 255, such that a federal injunction against him "will be effective with respect to the underlying claim," *Limehouse*, 549 F.3d at 333. That is fatal to their case.

36

Plaintiffs' claim against the Secretary fails for the same reason. Plaintiffs' only attempt at connecting the Secretary to the enforcement of, or specific authority over, conditions of confinement within the corrections system is to assert that "Secretary Sorsaia is charged with providing support, oversight, and guidance to the West Virginia Division of Corrections and Rehabilitation." JA18. Oversight and guidance—that is, general supervision—is not sufficient to satisfy the *Ex parte Young* exception. For the same reasons that Plaintiffs' claim fails for lack of standing, their claim fails to satisfy *Ex parte Young*.

**B.    Plaintiffs fail to state a claim of deliberate indifference under the Eighth Amendment against either the Governor or the Secretary.**

To survive a motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Here, Plaintiffs allege a single cause of action, seeking injunctive and declaratory relief under 42 U.S.C. § 1983 for violations of the Eighth Amendment. JA39–40.

37

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. In the context of this type of case, "the Eighth Amendment imposes a duty on prison officials to 'provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (cleaned up)). The Eighth Amendment test for deliberate indifference contains both an objective element—the inmate was exposed to a substantial risk of serious harm—*and* a subjective element—the prison official knew of and disregarded that substantial risk. *See Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Failure to establish either is dispositive. *See Wilson v. Seiter*, 501 U.S. 294, 297–304 (1991).

1. **Plaintiffs fail to allege conditions of confinement sufficiently serious to amount to an Eighth Amendment violation.**

To satisfy the objective prong, the plaintiff must allege a deprivation that is "sufficiently serious" to "result in the denial of 'the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834. The plaintiff may also allege facts sufficient to show that he is incarcerated

38

under conditions that create "a substantial risk" of "serious or significant physical or emotional injury" caused by exposure to the challenged conditions. *Scinto*, 841 F.3d at 225. In other words, general allegations as to overcrowding, understaffing, and deferred maintenance are not sufficient to allege an Eighth Amendment violation. *See Rhodes v. Chapman*, 452 U.S. 337, 347–48 (1981) (concluding that overcrowding is not per se unconstitutional). Instead, Plaintiffs must allege facts sufficient to show that overcrowding, understaffing, or deferred maintenance *caused* Plaintiffs alleged injuries *and* that those injuries constitute an "unquestioned and serious deprivation of basic human needs," otherwise those conditions, though harsh, are "part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 347.

Here, Plaintiffs allege isolated incidents of disrepair that do not amount to deprivations of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. And to the extent that any single condition may, if experienced over time, amount to a constitutional violation, they made no such allegations. Nor do Plaintiffs allege facts sufficient to plausibly establish that the complained-of conditions occur *throughout* their resident facilities—let alone at any other correctional

facility in the State. For example, they complain that they were served inadequate portions of food, or undercooked food. Yet they fail to allege how often they were served allegedly inadequate or undercooked food, when that occurred, or what harm, if any, was inflicted. Moreover, Plaintiffs fail to allege any facts that would support a claim that the entire facility in which they were housed routinely served inadequate or undercooked food, or that any other correctional facility routinely did so. Without such allegations, Plaintiffs fail to plausibly make out constitutional violations.

Perhaps recognizing this inadequacy, Plaintiffs' opening brief shifts the focus of their claims from alleged underfunding to an *overcrowding* theory. And despite their new reliance on this overcrowding theory, they ignore that overcrowding is not per se unconstitutional. *Rhodes v. Chapman*, 452 U.S. 337, 347–48 (1981). Indeed, in *Brown v. Plata*, the Supreme Court considered overcrowding only to the extent that it prevented the inmates in that case from receiving adequate medical care.[4] 563 U.S. 493, 541 (2011) (affirming

---

[4] The complaint contains no allegation that any of the Plaintiffs received inadequate medical care.

40

panel ruling that, under the circumstances, a population level of 137.5% above capacity was sufficient to alleviate the constitutional concerns raised in that case).

Far from alleging overcrowding that causes deprivations so extreme as to amount to constitutional violations, Plaintiffs make only conclusory statements that West Virginia's correctional facilities are overcrowded. They then rely on allegations that overcrowding, generally, "makes a facility less safe, secure, and humane than it could be." JA26. This allegation amounts to nothing more than an argument that overcrowding is, in and of itself, unconstitutional.

But that is plainly not the law. *Rhodes*, 452 U.S. at 347–48 (rejecting district court opinion concluding that double celling is unconstitutional where it does not deprive inmates of their basic life necessities). Plaintiffs' only specific allegations regarding overcrowding come from Plaintiff Randall, who alleges that he "was housed in overcrowded cells" and "observed inmates sleeping on the floor while at Southwestern." JA36. But Mr. Randall does not specify what exactly "overcrowded cells" are, nor does he allege how often he saw inmates on the dayroom floor, when, or for how long. This allegation is thus purely

conclusory. No other Plaintiff makes any allegation related to the number of inmates in their facilities.

In all, Plaintiffs do not allege conditions so extreme as to constitute "denial of the minimal civilized measure of life's necessities." To the extent that they now claim that they have alleged that they faced a substantial risk of danger due to overcrowding, understaffing, or deferred maintenance in the jails, they make no allegation that they were aware of any risk of danger or suffered in any way from such a risk. The District Court's dismissal order can therefore be affirmed because Plaintiffs fail to plausibly allege the objective prong of the deliberate indifference test.

> **2. Plaintiffs fail to allege facts showing that either the Governor or the Secretary were subjectively deliberately indifferent to the health and safety needs of West Virginia inmates.**

To satisfy the subjective element of an Eighth Amendment claim, "plaintiffs must show that prison officials acted with a sufficiently culpable state of mind." *Scinto*, 841 F.3d at 225 (cleaned up). That state of mind is deliberate indifference, which the Supreme Court has likened to criminal recklessness. *Farmer*, 511 U.S. at 839–40. This means that the plaintiff must allege facts sufficient to plausibly show that "the

official knew of and disregarded an excessive risk to inmate health or safety," or that "the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and . . . drew that inference.'" *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 835, 837) (cleaned up). Finally, "[b]ecause vicarious liability is inappropriate to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Plaintiffs fail to do so here. In fact, the allegations contained within the complaint demonstrate not only that the Governor recognized the issues in the correctional system, but that he acted to remedy them. In short, Plaintiffs have pleaded themselves out of court by affirmatively alleging that the Governor's subjective state of mind was focused on fixing the problems identified in the state correctional system.

The complaint affirmatively recognizes that the Governor issued Executive Order 5-22 in which he deployed the National Guard to help staff correctional facilities. JA100. As a result of that executive order,

43

"[t]hree hundred National Guard members were inserted into the jails and prisons to help with the severe understaffing in the late summer of 2022." JA22. And on top of that, the complaint incorporates a news article in footnote 1 in which the Governor indicated that he was engaged in meetings with members of the Legislature to work toward an agreement on solving the staffing issues. JA22. With respect to deferred maintenance, the complaint alleges that (at filing) there were approximately $60 million worth of repairs that were considered critical, and that the Governor was then "planning on spending $100 million on deferred maintenance." JA28; JA30. Far from showing that the Governor recklessly disregarded the alleged unconstitutional conditions in West Virginia's correctional facilities, Plaintiffs affirmatively alleged in detail that the Governor had been and is working to *remedy those conditions*. The Governor's actions—*as alleged in the complaint*—do not establish criminal recklessness, but just the opposite.

Plaintiffs also fail to allege facts sufficient to establish subjective deliberate indifference by the Secretary. Indeed, the complaint fails to allege *any* actions or inactions taken by the Secretary that would bear

44

on the subjective element of his state of mind. That alone warrants dismissal. The only allegations with respect to the Secretary are that (1) he is the Cabinet Secretary of the West Virginia Department of Homeland Security, (2) he is charged by statute with "providing support, oversight, and guidance" to that department, and (3) he resides in Putnam County, West Virginia. JA18–19. With no allegation as to the Secretary's subjective knowledge or action, Plaintiffs manifestly fail to state an Eighth Amendment claim against him.

*     *     *

The District Court's order can therefore be affirmed because Plaintiffs fail to plausibly allege either the objective or the subjective prong of their deliberative indifference claim under the Eighth Amendment as to either the Governor or the Secretary.

### C. The Tenth Amendment bars the claims against the Governor and the Secretary.

As made clear in the West Virginia Constitution and as alleged in Plaintiffs' complaint, neither the Governor nor the Secretary has the power to allocate money to the Division of Corrections and Rehabilitation, much less to any single facility or project. So now, Plaintiffs argue that because the Governor did not spend funds out of

45

his quasi-discretionary Civil Contingent Fund on corrections, he acted with deliberate indifference in violation of the Eighth Amendment. (No matter, apparently, that Plaintiffs have never pleaded a word of this.)

The Civil Contingent Fund is a fund to which the Legislature, in general, allocates money intended to be used for unplanned and emergency expenses. Often, but not always, the money allocated to the fund is earmarked by the Legislature for a specific project. *See e.g.*, H.B. 2024, 2023 Leg., Reg, Sess., at 198 (W. Va. 2023) (allocating $228 million to the Civil Contingent Fund to address deferred maintenance at the State's schools, universities, prisons, jails, and juvenile facilities). The money that is not earmarked can be spent (or saved) as the Governor "may deem necessary or proper." W. Va. Code § 5–1–18. In short, the non-earmarked funds are appropriated for use as the Governor sees fit in his discretion.

To the extent the complaint references the Governor's discretionary spending ability, it is asking the federal court to substitute its policy judgment in place of that of the Governor. That is impermissible.

46

For example, Plaintiffs take issue with the fact that the Governor (at the time of filing) was "only planning on spending $100 million on deferred maintenance," presumably from the $228 million then-allocated to the Civil Contingent Fund. JA30; JA97–99 (discussing planned spending on deferred maintenance from money also allocated for higher ed and secondary schools). In essence, Plaintiffs' allegation is that the Governor's policy decision to split a $228 million allocation between schools and prisons violates the Eighth Amendment and justifies a federal judiciary decree to "correct" his policy judgment.

But *Ex parte Young* itself made clear long ago that what Plaintiffs seek is not within the federal judicial power to grant: "There is no doubt that the court cannot control the exercise of the discretion of an officer. It can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action." *Ex parte Young*, 209 U.S. 123, 158 (1908). An injunction may only issue against a government official to "prevent him from doing that which he has no legal right to do." *Id* at 159.

What is more, the Tenth Amendment to the United States Constitution also stands in the way of Plaintiffs. It provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. 10. By its very structure, the federal constitution "established a system of dual sovereignty," preventing any arm of the federal government from stepping into the shoes of the State's legislature or executive to manage the State's own affairs. *See Printz v. United States*, 521 U.S. 898, 918–919 (1997). It is through this design that "[t]he Constitution contemplates that a State's government will represent and remain accountable to its people." *Id.* at 920.

Here, the complaint seeks an order compelling the Governor and the Secretary to "submit bills, call for special sessions, etc." to obtain funding to remedy deferred maintenance and to hire and pay correctional staff. Both submitting bills and calling for a special session are discretionary acts that "the court cannot control." *Ex parte Young*, 209 U.S. at 158. And although not pleaded anywhere in the complaint, Plaintiffs assert that the Governor could spend discretionary funds to perform some of the deferred maintenance and/or use his pardon power

48

to alleviate overcrowding. Opening Br. at 20 ("Governor Justice has the power to release inmates to bring the correctional system into constitutional compliance."); *id.* at 24 ("[T]he District Court did not consider the Governor's discretionary fund in the analysis.").

Ordering a State's governor to perform any discretionary duty, like spending discretionary funds, calling an extraordinary session of the Legislature, or releasing prisoners violates the State's sovereignty and removes the Governor's accountability to the people, thereby triggering the Tenth Amendment. Plaintiffs essentially ask the federal court to order the Governor and Secretary to exercise their policy judgment in a particular way—without consideration for the multitude of legitimate influences on a state government's decisions to spend public dollars. Such an order would be an anathema to our very structure of American government, violating both principles of federalism and the separation of powers in one fell swoop. This Court can therefore affirm the District Court's dismissal order because Plaintiffs' requested relief would violate the Tenth Amendment.

49

### D.    Plaintiffs' claims are moot.

This Court can also affirm the District Court's order because Plaintiffs' Eighth Amendment claims are now moot.

"To be justiciable under Article III of the Constitution, the conflict between litigants must present a 'case or controversy' both at the time it was filed and at the time it is being decided." *Ross v. Reed*, 719 F.2d 689, 694 (4th Cir. 1983). "Simply stated, a case is moot when the issues presented are no longer 'live.'" *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Federal courts have "no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992).

Here, to the extent that Plaintiffs have alleged a deliberate indifference claim against the Governor for failure to allocate or spend funds to address deferred maintenance and staff shortages, those claims have been mooted by the subsequent allocation and spending of funds to address staff shortages and deferred maintenance.

Plaintiffs complain that the Governor has not allocated money to address deferred maintenance in West Virginia prisons or to increase

50

salaries for correctional officers. And although the Governor does not allocate funds, the Legislature has now passed, and the Governor has signed, appropriations to increase correctional officer salaries and to address deferred maintenance. In addition to the $228 million allocated (before the complaint was filed) to address deferred maintenance in schools and prisons—$100 million of which has been or will be spent on deferred maintenance in corrections—the Legislature appropriated, on August 8, 2023, an additional $15 million to further address deferred maintenance. SB 1039, 2023 Leg. 1st Spec. Sess. (W. Va. 2023).[5] Through separate legislation, the Legislature allocated funds to increase correctional officer pay, and on July 1, 2024, the Commissioner of the West Virginia Division of Corrections and Rehabilitation announced a pay increase to the starting salary of all correctional officers, along with a large raise upon completion of their second year in service.[6] In sum, the

---

[5] The Court may take judicial notice of legislation passed by the West Virginia Legislature and of a public press release in reviewing this order on motions to dismiss. In reviewing a dismissal order, the Court may properly take judicial notice of matters of public record. *Hall v. Virginia,* 385 F.3d 421, 424 (4th Cir. 2004).

[6] https://dcr.wv.gov/news/Pages/WV-DCR-announces-new-pay-rates-in-effect-July-1.aspx

51

District Court's dismissal order can be affirmed because the harm

identified by Plaintiffs is being remedied, making their claims now moot.

## CONCLUSION

For the foregoing reasons, the District Court's order should be

affirmed.

## STATEMENT ON ORAL ARGUMENT

Oral argument will not assist the Court in deciding this appeal.

The facts and legal arguments are adequately presented in the briefs

and record.

October 10, 2024                    Respectfully submitted,

**JAMES C. JUSTICE, II.,**
**GOVERNOR**

**By counsel:**

/s/ J. Zak Ritchie
J. Zak Ritchie (WVSB #11705)
Michael B. Hissam (WVSB #11526)
Maureen Gleason (WVSB #14452)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
681-265-3802 *office*
304-982-8056 *fax*
zritchie@hfdrlaw.com
mhissam@hfdrlaw.com
mgleason@hfdrlaw.com

**MARK SORSAIA,
CABINET SECRETARY OF THE
DEPARMENT OF HOMELAND
SECURITY**

**By counsel:**

/s/ Natalie C. Schaefer
Natalie C. Schaefer (WVSB #9103)
Caleb B. David (WVSB #12732)
Kimberly M. Bandy (WVSB #10081)
SHUMAN MCCUSKEY SLICER PLLC
P.O. Box 3953
Charleston, WV 25339
(304) 345-1400; (304) 343-1826 (fax)
nschaefer@shumanlaw.com
cdavid@shumanlaw.com
kbandy@shumanlaw.com

**CERTIFICATE OF COMPLIANCE**

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this document contains <u>9,901 words</u>.

2.    This document complies with the typeface requirements because:

    This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Century Schoolbook</u>.

Respectfully submitted, this 10th day of October 2024

**By counsel:**

<u>/s/ J. Zak Ritchie</u>
J. Zak Ritchie (WVSB #11705)